No. 2597.

JOHN HOLSEY *v.* THE STATE.

1. PRACTICE.—The rule obtains in this State that "whenever there is reason to apprehend that injury may have resulted to the defendant, especially in a case of felony, from a failure to observe directions given the court by the Legislature, the judgment of conviction will be reversed."

2. SAME.—Subdivision 3 of article 660 of the Code of Criminal Procedure, which provides, in substance, that at the inception of the trial the prosecuting counsel shall state to the jury the nature of the accusation against the defendant, and the facts which are expected to be proved by the State in support thereof, is merely directory, and its disregard is not cause for reversal unless there be cause to apprehend that such disregard resulted injuriously to the rights of the defendant. Such probable injury is not apparent in this case.

3. SAME—EVIDENCE.—An inquiry as to character must be limited to the general reputation of the person impugned in the community of his residence or where he is best known, and the witness must speak from his knowledge of that general reputation, and not from his own individual opinion. If the defendant voluntarily puts his character in issue, the prosecution is entitled to rebutting evidence if it can produce it, but such evidence must be confined to the general reputation of the defendant, and can not be extended to particular acts. There is no rule of law which will permit an inquiry into the character of the defendant's associates, and in permitting such inquiry in this case the trial court erred.

4. THEFT—CHARGE OF THE COURT—FRAUDULENT INTENT in the taking of the alleged stolen property must be shown in order to authorize a conviction for theft, and it devolves upon the trial court to so instruct the jury affirmatively and directly.

APPEAL from the District Court of Bexar. · Tried below before the Hon. G. H. Noonan.

The conviction in this case was for the theft of two mules, the property of Frank Sherwood, in Bexar county, Texas, on the first day of April, 1886. The penalty assessed against the appellant was a term of five years in the penitentiary.

Frank Sherwood was the first witness for the State. He testified, in substance, that he had seen the defendant prior to this trial, and knew that for a time he lived in the cedar brakes in Kendall county. Witness, driving a wagon drawn by a mule and a horse, and his brother driving a wagon drawn by two mules and two horses, all of which animals belonged to the witness, went into camp about sundown on the evening of April 1, 1886, at a point on the San Antonio and Boerne road, in Bexar county, Texas, about twenty-one miles from San Antonio. He hoppled his said horses and mules and turned them out of camp to graze during the night, and last saw them all together at about nine o'clock. Two of the mules, a bay and a brown, disappeared during the night. From information subsequently obtained from T. M. Prince, in San Marcos, in Hays county, the witness went to the house of William Ray, about three miles from Manor, in Travis county, where he found his said mules in the possession of the said Ray. Ray exhibited no bill of sale.

B. F. Kirkendall testified, for the State, in substance, that he knew John and Bud Holsey and John Rawles, who, prior to March 31, 1886, lived together in a tent in the cedar brake, in Kendall county, about twenty miles from the twenty-first mile post out from San Antonio on the Boerne road. On the afternoon of March 31, 1886, the witness, then on his way to San Antonio, met the said Holseys and Rawles at a point on the Guadalupe river, about five miles from their tents and about twenty miles from the said twenty-first mile post. They were on horseback, and traveling towards their tents. They said they had been hunting Silas Davis's horses, but, as it was late, were going home. Witness never afterwards saw the Holseys, or either of them, or Rawles, in the cedar brake. Witness arrived in San Antonio on the next day, April 1, 1886. At a branch, about five miles out from San Antonio, the witness met Frank Sherwood, going towards Boerne.

Cross examined, the witness said that the five mile branch, where he met Sherwood on April 1, and the point on the Guada-

lupe where, twenty-four hours before, he met the Holseys and Rawles, were about thirty-five miles apart. Witness did not, on the said March 31, see the Holseys and Rawles nearer the San Antonio and Boerne road than twenty miles. He did not know where they went to after separating from him. Witness did not know how the mules passed out of the possession of Frank Sherwood.

Z. Mott, the next witness for the State, testified that he was with Kirkendall when he met the Holseys and Rawles on March 31, 1885. The place of meeting was near the back fence of the witness's field. Witness told the Holseys and Rawles where he had recently seen some horses that looked like the Davis horses. The Holseys and Rawles came to witness's house on the next morning, at about thirty minutes by sun, and said that they went to the horses described by witness, and found them not to be the Davis horses. When they left the witness and Kirkendall, on the evening before, they went towards their homes in the cedar brakes. The defendant at that time owned a bay and a light dun horse and a wagon.

T. M. Prince was the next witness for the State. He testified, in substance, that he was city marshal of the town of San Marcos in April, 1886. Some time in May, 1886, he met Frank Sherwood, who described the mules for which he was then looking. Witness told Sherwood that on or about April 2 or 3, 1886, he saw two such mules hitched to a two horse wagon, and in the possession of a woman. Witness was then confronted with Mrs. John Holsey, the wife of the defendant, but was unable to identify her as the woman he saw in charge of the wagon and mules. Sherwood afterwards passed through San Marcos, and had in his possession two mules which witness took to be the ones he previously saw hitched to the wagon in possession of the woman.

Cross examined, the witness stated that while the woman had the mules and wagon in possession, they stood on the public square for more than an hour. Witness had never heard any one question the defendant's character for honesty, and this was the first criminal charge witness had known to be brought against him. Witness had known the defendant for several years. At this point the defendant's counsel asked witness if he knew the defendant's character for honesty. The witness asked if he was interrogated as an officer or as a private citizen. He was then asked by the counsel if he knew the defendant's reputation for honesty. He replied that he had never heard his

honesty assailed, except that he associated with people who were supposed to be dealers in stolen stock, and for that reason was watched by the officers.

Elijah Hicks, the uncle of the defendant and his brother Bud, was the next witness for the State. He testified that he lived in Caldwell county, Texas, about seven miles northeast from San Marcos. Defendant and his wife and Bud Holsey came to witness's house on the first Sunday in April, 1886, Bud riding his sorrel horse, and defendant and his wife in a wagon drawn by two mules. Defendant's two horses which he brought with him were turned into witness pasture. Defendant and his wife, with the wagon and mules, left witness's house on the following Tuesday, and Bud Holsey two or three days later. About two weeks later defendant and his wife came back to witness's house, accompanied by John Rawles. Just before his return with his wife, defendant came to witness's house and got his horses to pull his wagon home. He said that he had been to the house of his mother-in-law, but did not say what he had done with the mules.

Mrs. M. K. Ray, an aunt of the defendant's wife, was the next witness for the State. She testified that she lived below Manor, in Travis county, about eighteen miles northeast of Austin. Witness was at her father's house in the spring of 1886, and saw the defendant and his wife and child, his brother Bud, and John Rawles, at that house. Defendant had a wagon and two mules. Witness understood that defendant sold the mules to her husband. Witness did not see or hear the trade, but understood that no bill of sale passed, and that the mules were sold to her husband on credit, to be paid for in the fall, when a bill of sale was to be executed. The trade was made between April 10 and 20. Defendant left by rail on the day after the trade, and soon returned with a pair of horses. Three weeks later Mr. Sherwood appeared, claimed and recovered the mules.

William Ray, the husband of the last witness, testified, for the State, that John and Bud Holsey and Tom Lockwood came to his house in April, 1886. Witness had never seen the man Rawles. He did not accompany his wife to her father's house on the occasion referred to by her, but joined her there three days later. He first met defendant at Lockwood's house, where the proposition to buy the mules was made by witness. Defendant accompanied witness to his house, where the trade was made. Witness executed his note for one hundred and twenty-five dol-

lars, payable to the defendant in November, 1886, when he was to receive from the said defendant a bill of sale conveying the mules. The defendant claimed to own the mules and to have authority to sell them. Witness denied that he ever told Sherwood that he made a cash payment to defendant of fifty dollars on the mules.

The State closed.

Mrs. N. C. Holsey, the wife of the defendant, was his first witness. She testified, in substance, that the defendant, accompanied by herself and his brother Bud, left home on the morning of April 2, 1886, to visit the witness's mother, who lived in Travis county. Defendant and his brother Bud did not leave the defendant's house during the day preceding their departure on the said visit. Witness could not remember where they camped on the first night out. They camped on the second night (April 4) on York creek. They were then traveling in the defendant's wagon, drawn by the defendant's two horses. While camped on York creek, John Rawles came to them having in his possession the two mules afterward claimed by Mr. Sherwood. Those two mules he traded to the defendant for one of his horses and thirty-five dollars in money, which the witness provided. Rawles left with the horse and money, leaving the two mules in camp. The journey was then resumed, the two mules being worked to the wagon and Bud Holsey riding the remaining horse. The party having in their possession only the wagon, the two mules and the one horse, reached the house of Elijah Hicks, in Caldwell county, on Sunday. They remained at Hicks's two or three days and went on to witness's mother's house. Defendant sold the two mules to William Ray for one hundred and twenty-five dollars, on credit, taking his promissory note.

Defendant went back to Hicks's house and borrowed a horse of Hicks to work with his horse in getting back home.

Cross examined, the witness reiterated that the defendant took but one horse to Hicks's house. The party did not pass through the town of San Marcos, but, going east through New Braunfels, traveled the Boerne and New Braunfels road. John Rawles was not at defendant's house on April 2, when the journey was commenced, nor on the day before. Defendant did not leave his house on April 1, and could not then have been in Z. Mott's neighborhood. Defendant and Bud Holsey did make a search for Davis's horses, for Mrs. Davis, but that was three or four days prior to April 2.

Mrs. B. R. Holsey, the defendant's mother, testified, in his behalf, that she was present when defendant, his wife and brother, left home on the morning of April 2, 1886, to visit Travis county. They left in defendant's wagon, drawn by defendant's two horses. Some time after they left, John Rawles, whom witness had not seen for two or three days, came to the house leading two mules, for which he said he had traded two horses, with a Mexican. He asked for defendant and his brother. Witness told him that they had started to Travis county. About mid-afternoon, Rawles left with the mules, saying that he was going on a visit to his sister, near Austin, in Travis county.

On her cross-examination, the witness stated that the defendant and Bud Holsey were at home throughout the day of April, 1. Rawles was not there on that day, nor was he there on March 31. When defendant and his wife got back from Travis county, they had one of defendant's horses, and one of Elijah Hicks's horses. Rawles came to the house a few days later, and said that he had been to see his sister, who lived in Travis county. Witness's daughter was present when Rawles brought the two mules to witness's house, on April 2, 1887. The two Holseys were at home all day on March 31, and consequently could not have been horse hunting with Rawles.

Mrs. Scott, the mother-in-law of the defendant, testified that, on the morning following the arrival at her house in Travis county of defendant, she saw John Rawles riding a horse which she knew to have belonged to defendant. Rawles was frequently at witness's house. While at witness's house, defendant sold two mules to William Ray. He then went off by rail, and returned with two horses to pull his wagon home.

The material part of the testimony of J. L. Holsey, the defendant's father, was, that defendant started to Travis county on the morning of April 2, driving his own horses. He returned with one of his own and one of Elijah Hicks's horses.

The cross-examination of this witness elicited nothing material except his statement that the defendant and Bud Holsey spent the day previous to their departure for Travis county, hunting Silas Davis's horses. He did not see Rawles on that day. Several witnesses were introduced who supported the defendant's reputation for honesty, and the defense closed.

Elijah Hicks, being recalled by the State, in rebuttal, testified that defendant with his wife and brother, Bud, brought to his house on the first Sunday in April, defendant's two certain sorrel

horses, which the witness knew well, and two mules. The two horses described were the horses afterwards used by defendant to draw his wagon back home.

The motion for new trial raised the questions discussed in the opinion.

No brief for the appellant has reached the Reporters.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE. Article 660 of the Code of Criminal Procedure, which prescribes the order in which a trial before a jury shall be conducted, provides in subdivision 3 that "the district attorney or the counsel prosecuting in his absence, shall state to the jury the nature of the accusation and the facts which are expected to be proved by the State in support thereof." This subdivision of said article we construe to be merely *directory,* and a disregard thereof is not, in our opinion, per se such error as invalidates a conviction.

"Wherever there is reason to apprehend that injury may have resulted to the defendant, especially in a case of felony, from a failure to observe directions given the court by the Legislature, we think, unquestionably, the judgment should be reversed." (Campbell v. The State, 42 Texas, 591.) There is no apparent reason for apprehending that a disregard of the direction contained in subdivision three resulted injuriously to the defendant, and it is not made to appear in the record that any injury did result to him therefrom. This requirement is quite different from that contained in subdivision one of said article, and which this court has held to be mandatory, and a disregard of which is per se material error, although injury to the defendant be not shown to have resulted therefrom. (Wilkins v. The State, 15 Texas Ct. App., 420; White v. The State, 18 Texas Ct. App., 57.) The hold, therefore, that the error complained of in defendant's bill of exception number one is not a material one.

We will remark, however, that in the conduct of trials the directions prescribed by the statute should be strictly followed, and especially when those directions are insisted upon by the defendant. The Legislative will, when plainly expressed, should be observed and rigidly adhered to by the courts in matters of practice, as well as in all other respects.

When the defendant has voluntarily put his character in issue, the prosecution may introduce evidence in rebuttal, but ordinarily such rebutting testimony must be confined to general reputation and can not be extended to particular acts. An inquiry as to character must be limited to the general reputation of the person in the community of his residence, or where he is best known, and the witness must speak from his knowlege of this general character, and not from his own individual opinion. (Brownlee v. The State, 13 Texas Ct. App., 255; Wharton's Criminal Evidence, section 61.) The evidence as to character should be confined to the *defendant's* character alone, and the inquiry should not be extended to the charact⁀ of others connected with him, or with whom he may associate. We know of no rule of evidence which authorizes an inquiry as to the character of a defendant's associates. In the case before us such evidence was admitted over defendant's objection, and was clearly calculated to operate to his prejudice. Because of this error the conviction should not be permitted to stand.

There is a defect in the charge of the court, which, though not excepted to, we think proper to notice. In defining theft, it omits the word "fraudulent," and the jury are no where in the charge directly instructed that to constitute theft there must be a *fraudulent* taking of the property. Considering the charge as a whole, it inferentially means that the taking must have been *fraudulent*, but, as the fraudulent intent is the very gist of this offense, the jury should have been directly and plainly so instructed. In other respects, the charge of the court does not appear to be objectionable in any material particular.

Because the court erred in admitting the testimony of the witness Prince, relative to the character of the defendant's associates, and that because of the character of said associates the defendant had been under the surveillance of the officers; and also because of the error in the charge above mentioned; and, further, because of the unsatisfactory and inconclusive character of the evidence upon which the conviction is based, the judgment is reversed, and cause is remanded.

*Reversed and remanded.*

Opinion delivered October 22, 1887.